**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **FRED ORA RIDINGS III,** | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **A-14-CA-879-LY** |
| | § | |
| **WILLIAM STEPHENS, Director,** | § | |
| **Texas Dept. of Criminal Justice–** | § | |
| **Correctional Institutions Division,** | § | |
| **Respondent.** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE LEE YEAKEL
      UNITED STATES DISTRICT JUDGE

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas. Before the Court are Petitioner's Application for Habeas Corpus Relief under 28 U.S.C. § 2254 (Document 1); Petitioner's Memorandum of Law in Support (Document 5); Respondent's Answer (Document 11); and Petitioner's response thereto (Document 13). Petitioner, proceeding pro se, has paid the filing fee for his application. For the reasons set forth below, the undersigned finds that Petitioner's application for writ of habeas corpus should be denied.

**STATEMENT OF THE CASE**

**A.**    **Petitioner's Criminal History**

According to Respondent, the Director has lawful and valid custody of Petitioner pursuant to a judgment and sentence of the 167th Judicial District Court of Travis County, Texas, in cause number D-1-DC-09-904115. Petitioner was charged with murder. A jury found Petitioner guilty,

and the trial court sentenced him to 32 years of imprisonment. On January 26, 2012, the Eleventh Court of Appeals affirmed Petitioner's conviction and sentence. *Ridings v. State*, 357 S.W.3d 855 (Tex. App.—Eastland Jan. 26, 2012). The Texas Court of Criminal Appeals refused Petitioner's petition for discretionary review. *Ridings v. State*, No. PD-0343-12 (Tex. Crim. App. May 2, 2012).

Petitioner then filed a state application for a writ of habeas corpus. The Texas Court of Criminal Appeals ordered the trial court to make findings of fact. *Ex Parte Ridings*, No. WR–80,201–01, 2013 WL 6672943, at *1 (Tex. Crim. App. Dec. 18, 2013). The trial court made findings of fact, which the Court of Criminal Appeals adopted and then denied the application without a written order on September 17, 2014. *Ex Parte Ridings*, No. 80,201-01 at cover.

**B.    Factual Background**

The factual background of this case is found in the Court of Appeals' opinion and is repeated below.

> On August 6, 2008, Austin Police Officer Thomas Castonguay heard five nearby gunshots during his evening patrol shift. Calling to report the gunshots, he heard two additional shots. Other people also began calling the Austin Police Department. Officer Christi Bergh responded to a call from the dispatcher who directed her to go to 1103B North Meadows in Austin, an address that was only about 150 yards from where Officer Castonguay heard the shots. There she found people trying to give first aid to a wounded man lying on the ground. The victim, Ronnie Whited, died from his wounds and was identified by his twin brother, Donnie Whited, who was at the scene.
>
> Robert Woolsey lived at 1103B North Meadows and was there that day. He testified that Wendy Fosdick, his sister Laura, and the twins were at the duplex. Wendy, Laura, and Donnie lived there at the time. Laura and Donnie were outside "cooking methamphetamines." Woolsey and Wendy were inside watching television. Around 8:30 or 9:00 p.m., Howard Beard appeared in Woolsey's backyard. A week earlier, Beard had been at Woolsey's duplex and overdosed on heroin. Beard believed that his guitar had been stolen from his pickup at that time. Appellant had driven Beard in his white minivan to Woolsey's duplex because Beard was trying to locate his

guitar.  In addition, appellant had a dispute with the twins over drugs that the twins had not delivered to him.

Woolsey said that he went over to speak with appellant, who was in the driver's seat of the white minivan.  Woolsey asked appellant if there was a problem, and appellant replied that "he just wanted what he was owed."  Not knowing what appellant was talking about, Woolsey asked Donnie if he owed appellant anything.  Donnie said that he did not, and Woolsey walked back into his apartment.  Before going inside, Woolsey saw Donnie throw rocks at the minivan.  Woolsey was almost to his bedroom when he heard gunshots, but he did not know who fired the weapon.

At about 11:30 or 12:00 that night, Woolsey was cooking dinner with Wendy when he heard two gunshots.  As he went toward the front door, he heard three or four more gunshots.  Again, he did not see who did the shooting.  As he ran outside, his sister yelled that someone had shot Ronnie.

Appellant's defense was that it was Beard who did the shooting.  When asked by the State to describe how appellant and Beard were dressed earlier that day, Woolsey said that appellant was wearing a hat but that Beard was not wearing a hat. Beard was wearing jeans and a shirt.  Woolsey also testified that Beard had not made any threats to anyone that day but that he was unhappy about losing his guitar.

Marco Ornelas, a fourteen-year-old boy who lived nearby, testified that around midnight he had gone out to get his soccer ball when a white minivan pulled over. A white man got out from the driver's side with something like a shotgun, "racked" it, and shot once into the air.  The man was wearing a black baseball cap and black shorts.  Marco became scared and ran into his house. He then heard three or four more shots.  Marco thought that the man with the gun at midnight was the same man who came in the minivan earlier that evening and was arguing with the people at the duplex; however, he could not be certain because it was dark.  He described the man as being average height, "between five nine and six feet."

\*       \*       \*

Beard testified that he had ridden with appellant earlier in the day around three or four in the afternoon.   Appellant was taking Laura (Donnie's girlfriend and Woolsey's sister) from pharmacy to pharmacy to get Sudafed and other materials to make speed; Beard was riding with them because he had obtained some drugs from appellant.  Beard said that appellant told him that he had "invested in some stuff with [Laura]."  Beard told appellant that he would not "invest" anything with "kids nowadays" because "it is hard to get anything out of the kids."  Apparently, appellant had given money to Laura for drugs that had not been delivered.  They dropped Laura off at the Woolsey duplex and left.

3

Beard said that he and appellant returned to the Woolsey duplex a second time to check on his guitar.  Again, appellant had driven Beard there in the white minivan.  Beard claimed that there was an argument between appellant and the twins over drugs that the twins had not delivered.  According to Beard, appellant argued with the twins and then got back into the minivan.  Someone then threw rocks at the minivan.  Appellant pulled out a .38 revolver and shot two rounds into the yard.  Beard said that he pulled the revolver out of appellant's hand because "[i]t was dangerous, dangerous to the neighborhood, you know, don't shoot rounds off in the neighborhood."  After taking the gun, Beard told appellant that they needed to get out of there.

Appellant and Beard then took a friend, Melissa Correll, to Round Rock.  On the way back, appellant said that he was going back to the duplex to check on his drugs.  Beard said that he told appellant that he did not want to go there because appellant had fired the shots earlier.  Beard claimed that he got out at a Wendy's restaurant but did not go in because he was not wearing a shirt.  Appellant returned to pick Beard up in about fifteen to thirty minutes.  Their next stop was at a service station where they picked up Efrain Amaro.  Amaro had run out of gas and had a gas can in his hand; he needed a ride back to his car.

Almost immediately after leaving the service station, the police pulled the minivan over.  Beard testified that, "[b]efore the police had pulled us over, they were behind us, 15 strong behind us, I said what did you do.  [Appellant] said I shot him.  I went what?  I didn't ask anymore.  I was just freaked out."

*       *       *

Wendy Fosdick testified that she was staying with Woolsey in August 2008.  She admitted that she previously had a drug problem, but claimed she no longer had one.  Wendy said that she slept that day until about 4 p.m., when appellant came by with Beard and Correll.  Appellant was driving a white minivan.  At around 8:30 p.m., she spoke with appellant, who told her that being at Woolsey's duplex "wasn't going to be a very good place to be that evening."  She thought he meant that he was going to call the police about the drugs there.  She told Woolsey and Donnie about appellant's remark.

Wendy said that Beard was not wearing a hat because "[he] is not much for hats."  She recalled hearing gunshots early that evening and thought that the shots came from the minivan; however, she could only see the van's top over the wall.  Around midnight, she heard a strange noise and thought the police might be there.  As she ran out the front door and looked to the right, she saw a muzzle flash and heard the victim scream.  Then there were about four more gunshots.  She saw that a man had fired the shots; however, it was too dark to identify him.

4

An AK-47 rifle, a .38 revolver, and ammunition for both were found in the minivan. The officers also found shell casings for a .38 caliber revolver in appellant's pocket. Police Officer Matthew Jones said that appellant's first words after the stop were "don't let them steal my guns." Asked what guns, appellant replied, "My .38 Special with diamonds on it and my AK-47." Virginia Ridings, appellant's mother and a defense witness, later confirmed that appellant had brought the AK-47 rifle into their home. She also testified that she and her son were hunters and that her son was proficient with a rifle.

Gunshot primer residue analysis was done on all three men in the minivan, and all three had indications of primer residue on their hands. There was expert testimony that the 7.62 caliber bullet removed from the victim was fired from the AK-47 rifle belonging to appellant. The expert test-fired the rifle and concluded that the cartridges fired as a test and the five Winchester 7.62 x 39 fired cartridge cases found at the crime scene were all fired from appellant's rifle.

A senior forensic scientist at the Austin Police Department DNA Unit testified concerning the DNA profiles found on the rifle and the .38 caliber revolver. She testified that appellant could not be excluded as the contributor of the major component in the DNA profile at thirteen locations on the rifle, i.e., his DNA was the major component on the rifle. Beard and Amaro could be excluded. The DNA profile from the swab of the strap of the rifle was also analyzed. Neither appellant nor the victim could be excluded as contributors to the DNA profile on the rifle strap that came from at least three individuals; however, Beard and Amaro could be excluded. Thus, appellant and the victim were the contributors to the DNA stain on the rifle strap. Appellant also was found to be the contributor to the DNA profile on the magazine of the rifle. The expert concluded by saying that Beard's DNA was not found on any of the items she analyzed.

*Ridings*, 357 S.W.3d at 857–60.

## C.   Petitioner's Grounds for Relief

Petitioner first asserts that trial counsel was ineffective for:

a.      Failing to investigate;

b.      failing to prepare for, and present evidence at, Petitioner's competency hearing;

c.      allowing Petitioner to make strategic decisions during the trial;

d.      failing to introduce evidence that would have supported an accomplice-witness instruction;

e.      failing to rebut the State's assertion that Petitioner's mental-health issues are the result of drug use;

f       failing to present evidence that an eyewitness's description matched someone other than Petitioner; and

g.      failing to point out discrepancies in the State's time line that show he is innocent.

Petitioner also contends that new evidence from the DNA lab involved in his case undermines the DNA evidence presented at his trial.

## DISCUSSION AND ANALYSIS

**A.      Unexhausted Claim**

Petitioner raises a new claim of ineffective assistance of counsel in his Supplement to his Federal Petition.  Doc. 5 at 19.  Specifically, Petitioner alleges his counsel failed to note the inconsistencies between the testimony of the arresting officers, who said they arrested Petitioner around 12:20 am, and one of the admitted trial exhibits, which shows Petitioner in custody at 12:05 am.  Petitioner did not raise this ground for relief in his application for state habeas corpus relief. He has thus failed to exhaust this ground for relief, and this Court's consideration of that claim is procedurally barred.  *See Beazley v. Johnson*, 242 F.3d 248, 264 (5th Cir. 2001).

A subsequent state application for habeas corpus on Petitioner's unexhausted issue would be futile because it would be dismissed pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.07, § 4, as an abuse of the writ.  When a state court decision rests on a state law ground that is independent of a federal question and adequate to support the judgment, federal courts lack jurisdiction to review the merits of the case.  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  In order for a claim of procedural default to preclude federal review of a habeas petitioner's claim, the last state court issuing a reasoned decision must have clearly and unequivocally relied upon the procedural default

as an independent and adequate ground for denying relief. *Harris v. Reed*, 489 U.S. 255, 262 (1989). Additionally, even though a claim has not been reviewed by the state courts, this Court may find that claim to be procedurally barred. *Coleman*, 501 U.S. at 735. The general rule that a state court must explicitly apply a procedural bar to preclude federal review does not apply to those cases where a petitioner has failed to exhaust his state court remedies and the state court to which he would be required to present his unexhausted claims would now find those claims to be procedurally barred. *Id.* at n.1. A petitioner, however, can still obtain federal habeas review on a claim denied by the state court on the grounds of procedural default if he can show cause and actual prejudice for his procedural default or that a failure to address the federal claim would result in a miscarriage of justice. *Moore v. Roberts*, 83 F.3d 699, 702 (5th Cir. 1996), citing *Coleman*, 501 U.S. at 750.

Petitioner has failed to show cause and actual prejudice for his procedural default and has made no showing that a failure to address the merits of his claims would result in a miscarriage of justice. Therefore, Petitioner is barred from raising the unexhausted claim.

**B.      The Antiterrorism and Effective Death Penalty Act of 1996**

The Supreme Court has summarized the basic principles that have grown out of the Court's many cases interpreting the 1996 Antiterrorism and Effective Death Penalty Act. *See Harrington v. Richter*, – U.S. –, 131 S. Ct. 770, 783–85 (2011). The Court noted that the starting point for any federal court in reviewing a state conviction is 28 U.S.C. § 2254, which states in part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Court noted that "[b]y its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington*, 131 S. Ct. at 784.

One issue *Harrington* resolved was "whether § 2254(d) applies when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Id.* Following all of the Courts of Appeals' decisions on this question, *Harrington* concluded that the deference due a state court decision under § 2554(d) "does not require that there be an opinion from the state court explaining the state court's reasoning." *Id.* (citations omitted). The Court noted that it had previously concluded that "a state court need not cite nor even be aware of our cases under § 2254(d)." *Id.* (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)). When there is no explanation with a state court decision, the habeas petitioner's burden is to show there was "no reasonable basis for the state court to deny relief." *Id.* And even when a state court fails to state which element in a multi-part claim it found insufficient, deference is still due to that decision, because "§ 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Id.*

As *Harrington* noted, § 2254(d) permits the granting of federal habeas relief in only three circumstances: (1) when the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the Supreme Court; (2) when the earlier decision "involved an unreasonable application of" such law; or (3) when the decision "was based on an unreasonable

determination of the facts" in light of the record before the state court. *Harrington*, 131 S. Ct. at 785

(citing 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  The "contrary to"

requirement "refers to the holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions

as of the time of the relevant state-court decision." *Dowthitt v. Johnson*, 230 F.3d 733, 740 (5th Cir.

2000) (quotation and citation omitted).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state
> court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on
> a question of law or if the state court decides a case differently than . . . [the Supreme
> Court] has on a set of materially indistinguishable facts.

*Id.* at 740–41 (quotation and citation omitted).  Under the "unreasonable application" clause of

§ 2254(d)(1), a federal court may grant the writ "if the state court identifies the correct governing

legal principle from . . . [the Supreme Court's] decisions but unreasonably applies that principle to

the facts of the prisoner's case." *Id.* at 741 (quotation and citation omitted).  The provisions of

§ 2254(d)(2), which allow the granting of federal habeas relief when the state court made an

"unreasonable determination of the facts," are limited by the terms of the next section of the statute,

§ 2254(e).  That section states that a federal court must presume state court fact determinations to

be correct, though a petitioner can rebut that presumption by clear and convincing evidence.  *See* 28

U.S.C. § 2254(e)(1).  But absent such  a showing, the federal court must give deference to the state

court's fact findings.  *Id.*

## C.    Ineffective Assistance of Counsel

In his first ground for relief, Petitioner argues that he was denied effective assistance of

counsel.  Petitioner raised this issue in his state application for habeas corpus.  The state courts

rejected the merits of Petitioner's claim.  Thus, the AEDPA limits the scope of this Court's review

to determining whether the adjudication of Petitioner's claim by the state court either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Ineffective assistance of counsel claims are analyzed under the well-settled standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687. In deciding whether counsel's performance was deficient, the Court applies a standard of objective reasonableness, keeping in mind that judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 686–89. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (citation omitted). Ultimately, the focus of inquiry must be on the fundamental fairness of the proceedings whose result is being

challenged. *Id.* at 695–97.  Accordingly, in order to prevail on a claim of ineffective assistance of counsel, a convicted defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687.

      1.    <u>Failure to Investigate</u>

Petitioner first asserts that his trial attorney was ineffective for failing to investigate in preparation of trial.  He says counsel did not conduct pretrial interviews of certain witnesses, including Marco Ornelas, because, as trial counsel acknowledged in his affidavit, those witnesses "would be reluctant to testify, likely have to be attached by the State if located and would be subject to impeachment."  Doc. 5-1 at 5.

Even if counsel's decision not to locate and interview the witnesses constitutes deficient performance—and it is not clear it does—Petitioner has neither argued nor shown that he was prejudiced by counsel's decision.  Aside from mentioning Marco Ornelas, Petitioner does not say who his attorney should have interviewed, what those witnesses would have said, or how their testimony would have changed the outcome of his trial.  All of those elements must be shown for Petitioner to prevail on his claim of ineffective assistance based on trial counsel's alleged failure to investigate.  *See Trottie v. Stephens*, 720 F.3d 231, 243 (5th Cir. 2013); *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010).  Because Petitioner does not support his allegations, his claim fails on this ground.

      2.    <u>Failing to Present Evidence at Competency Hearing</u>

Petitioner next argues that trial counsel failed to prepare for Petitioner's competency hearing.  According to Petitioner, counsel did not consult Petitioner's mother, who would have testified or told

counsel about Petitioner's history of mental illness.  Instead, Petitioner asserts, counsel spent only three hours preparing for the hearing and made no use of the other evidence available to him. Petitioner notes that his mother informed counsel that Petitioner previously had been found incompetent and, as a result, was on social security disability.

To his § 2254 petition, Petitioner attached an affidavit and a few emails from trial counsel that counsel submitted in the state habeas corpus proceedings.  In one of those documents, an affidavit of trial counsel, he states he spoke "at great length" with the mental-health experts for the defense and the State.  Doc. 5-1 at 5.  Counsel says that, because he has worked with both experts, he knew the State's expert more often persuaded a jury than did the defense expert.  Counsel also said that he waived a jury at the competency hearing because he previously had worked with the magistrate judge assigned to the hearing and believed the magistrate judge would better understand the issue, not be swayed by the violent facts of the case, and sympathize better with the defense position.

This ground for relief suffers from the same defect as Petitioner's first ground.  Petitioner does not explain what evidence his mother would have provided or how that information would have changed the outcome of the competency evaluation or the trial.  The record instead shows that counsel moved for the hearing in an effort to spare his client a trial and then prepared for the hearing based on his decades of experience.  On this record, counsel's strategy regarding the hearing cannot be described as deficient.  And though it is possible Petitioner's mother would have added more detail to the evidence presented at the hearing, Petitioner does not say what that detail would have been or how it would have affected the outcome.  Accordingly, he has not demonstrated that he was prejudiced by any potential fault in counsel's decisions.  *See Gregory*, 601 F.3d at 352.

3.      Following Petitioner's Trial Strategy

Petitioner next says that counsel improperly followed Petitioner's strategy decisions even though counsel believed Petitioner was incompetent.  Petitioner bases this argument on one of the email messages attached to the § 2254 petition in which counsel notes Petitioner's refusal to use a defense of insanity at trial.  Petitioner suggests counsel decided against that defense solely because Petitioner adamantly opposed it.

Petitioner misinterprets the facts.  Trial counsel says in the attached email that he decided against using an insanity defense not only because of Petitioner's refusal but also because the mental-health experts for the defense and State told counsel that Petitioner's mental illness made him "too dangerous to be on the street."  Doc. 5-1 at 13.  Counsel thus decided against an insanity defense at trial and instead sought to "[c]reate reasonable doubt in the minds of the jurors."  *Id.* at 10.  Counsel swears in his affidavit that Petitioner's similar opposition to using an insanity defense "made for better attorney/client relations but was not determinative" of counsel's choice of strategy.  *Id.*  at 5.  Trial counsel also says in an earlier email that his strategy for the punishment phase was to present Petitioner as "a regular guy who succumbed to a mental illness."  *Id.*  at 10.  These two strategies are not inconsistent: If Petitioner were convicted at trial, counsel would attempt to use Petitioner's mental illness as a mitigating factor to obtain a lower sentence.[1]

In all events, Petitioner provides no showing that counsel chose the trial strategy based on Petitioner's directive or that the strategy chosen was inferior to a different strategy, which Petitioner does not describe.  The state court concluded as much, finding credible counsel's assertion in his

---

[1]Given Petitioner's sentence of 32 years' imprisonment, it is possible that mitigation strategy worked.  *See* TEX. PENAL CODE § 12.32 (setting punishment for first-degree felony offense, which includes murder, at life imprisonment or a term of between 5 and 99 years).

affidavit that his strategic decisions were "based on his professional judgment and not made simply in response to [Petitioner]'s desires."  Doc.  8-17 at 74.  Petitioner has not shown the state court's conclusion to be unreasonable.

      4.     <u>Failure to Present Evidence to Support an Accomplice-Witness Instruction</u>

In Petitioner's fourth ground for relief, he asserts trial counsel was ineffective for not presenting evidence to support giving the jury an accomplice-witness instruction.  According to Petitioner, his mother would have testified that Howard Beard encouraged Petitioner to get the gun used in the murder.  Had his mother testified about this event, Petitioner concludes, the instruction would have been given, and the outcome of the trial would have been different.

An accomplice-witness instruction advises a jury that "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."  TEX. CRIM. PROC. CODE art. 38.14.  Trial counsel requested that the trial court give this instruction to the jury.  The court denied the request because, the court explained, the evidence did not support a conclusion that Beard (or Efrain Amaro) acted to aid or assist Petitioner in the murder.  The court concluded that giving the instruction would confuse the jury and not provide proper or lawful legal aid to Petitioner.  Doc. 8-9 at 62.  Petitioner asserts counsel should have elicited testimony from Petitioner's mother that Beard told Petitioner, and Petitioner in turn told his mother, that Beard and Petitioner were "undercover CIA" and "will take care of him," with "him" purportedly meaning Ronnie Whited.

There are several problems with this argument.  First, the testimony not elicited from Petitioner's mother would have contained inadmissible hearsay within hearsay: She would have

testified about what Petitioner said to her (hearsay level one) about what Beard told Petitioner (hearsay level two).  Because that evidence would have been admitted for the truth of the statement—that Beard did tell Petitioner they were undercover CIA and to get the gun—and does not fall under any exception, it would have been inadmissible during the guilt phase of the trial.  *See* TEX. R. EVID. 805.  Second, even if admitted and even if the accomplice-witness instruction were given, it is not at all clear how the instruction would have helped Petitioner.  There was ample corroborating evidence connecting Petitioner to the crime, including the eyewitness testimony of Marco Ornelas and the DNA evidence linking Petitioner to the rifle, rifle magazine, and rifle strap.  Even if the instruction were given, allowing the jury to discredit some of Beard's testimony, it is likely Petitioner still would have been convicted.  Thus, the Court cannot conclude that counsel was ineffective for not eliciting this testimony, nor has Petitioner shown he was prejudiced without it.

      5.    <u>Failing to Rebut the State's Mental-Health Evidence</u>

Petitioner next contends that his counsel was ineffective for not introducing evidence to counter the State's assertion that Petitioner's mental illness was the result of drug use.  He insists the report of Dr. Hume would have provided helpful information and that counsel knew the report was useful.

During closing arguments in the penalty phase of Petitioner's trial, the State suggested "Perhaps the defendant's mental health has been compromised by his own actions, his choice to abuse illegal substances.  We do not know."  Petitioner's counsel did not object to that statement.  Before imposing sentence, the trial court noted its own concerns regarding Petitioner:

    [T]here is some disconnect in the defendant's thinking process.  The significance of it, the cause of it, whether or not it is the cause of a previous injury, whether it is a natural cause, or whether it is induced by illicit drugs, the Court really doesn't have

15

a fix on that.  The evidence is certainly unclear. . . .  So I am left here with just, you know, a few guideposts to try to go by.

Doc. 8-9 at 91.  Petitioner now suggests his attorney was ineffective for not objecting to the State's comment on Petitioner's mental health.

The Court disagrees with Petitioner.  Contrary to Petitioner's interpretation, the State did not "assert" that his drug use had led to his mental illness; rather, the State noted that his mental illness, which the defense had argued was a mitigating circumstance, had an unknown cause and could have been the result of Petitioner's own drug use.  In other words, the State argued simply that Petitioner's mental illness should not count as a mitigating factor, not that it was an aggravating factor.  That argument is not inherently inappropriate.  *Cf. Smith v. Quarterman*, 515 F.3d 392, 410 (5th Cir. 2008) (rejecting petitioner's argument that drug addiction could be considered a mitigating factor that reduced his moral culpability).  Moreover, the trial court said it did not rely on Petitioner's mental illness, or the potential cause, to determine the appropriate sentence because the evidence was "unclear on that" and the court "really doesn't have a fix on that."  The Court cannot conclude that without this single remark from the State, Petitioner's sentence would have been different. *See Nichols v. Scott*, 69 F.3d 1255, 1278 (5th Cir. 1995) (noting burden on the habeas petitioner to show "reasonable probability 'that but for these remarks' the result would have been different" (quoting *Felde v. Blackburn*, 795 F.2d 400, 403 (5th Cir. 1986)).

6.    Failing to Discredit Eyewitness Testimony

As his last ground for relief based on ineffective assistance, Petitioner argues his counsel failed to address the inconsistencies in the State's case against him.  Primarily, Petitioner says his

attorney did not point out to the jury that the testimony of Marco Ornelas, a witness for the State, more closely identified Howard Beard as the shooter than Petitioner.

Marco Ornelas testified that the driver of a white minivan exited his car with what looked like a shotgun, "racked" the gun, and fired once into the air.  Doc. 8-8 at 90.  The man, according to Ornelas, was wearing a black baseball cap.  Testimony from another witness revealed that Petitioner actually was wearing a brown hat that was not a baseball cap.  Counsel for Petitioner cross-examined Ornelas about his earlier statements to police officers, in which Ornelas said that because he was far away and it was nighttime, he could not tell who the man was.  *Id.* at 91.  Counsel also noted that Ornelas originally had not specified the side of the van from which the man exited. On redirect examination, Ornelas reviewed his previous description of the shooter who, Ornelas said, was "average height" of "[b]etween five nine and six feet" tall and had a "medium build."  *Id.* at 93. During his closing argument, counsel for Petitioner noted the discrepancy in Ornelas's testimony regarding the hat Ornelas believed the shooter was wearing, the distance from which Ornelas saw the shooter, and the poor lighting at the time of the shooting.

Despite Petitioner's assertions, the record shows counsel did highlight some of the problems with Ornelas's testimony.  The jury heard the conflicting evidence and arguments by counsel, and it could have concluded Ornelas's testimony was not credible.  Instead, the jury apparently believed Ornelas and concluded Petitioner was the man who killed Whited.  It does not appear that counsel specifically pointed out the difference in size of Petitioner and Beard.  But Beard testified at the trial, and Petitioner was there each day.  The jury saw both men and could have concluded that, from a distance and in the dark, Ornelas could have believed Petitioner was around six feet tall and a medium build.  Or the jury may have concluded that Ornelas's identification was lacking but that

17

the other evidence—such as the DNA evidence egarding the AK-47—supported Petitioner's guilt. Either way, Petitioner has not shown the jury's decision was the result of counsel's deficient performance. *See Dowthitt v. Johnson*, 230 F.3d 733, 751 (5th Cir. 2000) (finding no constitutional error in counsel's closing statement despite imperfections in counsel's argument). Moreover, Petitioner does not explain what could have been gained from counsel's additional questions or argument in closing or how the result of the trial would have been different. *See Knox v. Johnson*, 224 F.3d 470, 481 (5th Cir. 2000) (concluding that counsel did not perform deficiently despite failure to object to witness's testimony because sufficient other evidence supported verdict).

    7.    Conclusion

    Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence. Accordingly, the Court is of the opinion that 28 U.S.C. § 2254, as amended by the AEDPA, bars habeas corpus relief on Petitioner's claim that he received ineffective assistance of trial counsel.

**D.    DNA Evidence**

    In his final ground for relief, Petitioner says evidence now available, but unavailable at the time of his trial, would show the DNA evidence presented at his trial was potentially corrupt. According to Petitioner, one of the witnesses who testified from the DNA Lab filed a report in February 2010 alleging evidence in the lab had been mistreated by Clare McKenna, one of the expert witnesses who testified at Petitioner's trial regarding the DNA evidence. Petitioner says the state courts did not discuss this claim though Petitioner raised it in both his motion for a new trial and in his state habeas corpus application.

18

As Respondent explains, Petitioner has failed to show his case was in any was affected by the alleged problems at the DNA lab.  His claim is based entirely on speculation and unsupported allegations of error, which are insufficient to warrant relief under § 2254.  *See Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983).

Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence.  Accordingly, the Court is of the opinion that 28 U.S.C. § 2254, as amended by the AEDPA, bars habeas corpus relief on Petitioner's claim that the DNA evidence at his trial was unreliable.

## **RECOMMENDATION**

It is recommended that Petitioner's application for writ of habeas corpus be denied.

## **CERTIFICATE OF APPEALABILITY**

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1)(A).  Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would

find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of the Petitioner's section 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, it is respectfully recommended that the Court shall not issue a certificate of appealability.

## OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the

district court.  *See* 28 U.S.C. § 636(b)(1)(C);  *Thomas v. Arn*, 474 U.S. 140, 150–53 (1985);

*Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 13th day of July, 2015.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE